UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
EDWARD KERRY SULLIVAN,                             :
                                                                              :
                Plaintiff,                              :
                                                                              :
  -versus-                                                       :        **PLAINTIFF'S**
                                                                              :        **FIRST AMENDED**
                                                                              :        **COMPLAINT**
THE CITY OF NEW YORK; EDWARD RANIERI,    :
a New York City Police Officer, in his individual and   :
official capacities; and MATTHEW MAIORANA,      :        **JURY DEMANDED**
a New York City Police Officer, in his individual and   :
official capacities,                                              :
                                                                              :
                Defendants.                            :
------------------------------------------------------------------------x

## PRELIMINARY STATEMENT

1. This case seeks to vindicate the fundamental right of New Yorkers to criticize public officials free of police intimidation. The plaintiff, Edward Kerry Sullivan, has long been involved in environmental advocacy on Staten Island and has focused in particular on the Stapleton Homeport, an abandoned naval base on Staten Island's North Shore that was to have been converted into a public park. In response to a mounting effort by Staten Island Borough President James Molinaro to turn the site over to private developers, Mr. Sullivan mailed letters in early August to many government officials complaining about the lack of public access to the Homeport and about the prospect of private development of the site. He also published in the *Staten Island Advance* an attack on Borough Hall and its efforts to turn the Homeport over to private developers, closing with a plea to Staten Island voters: "Election Day is less th[a]n 75 days away. Don't forget who did

1

what for you in November." At the time, Mr. Molinaro was running for re-election as the borough president and was touting his efforts to develop the Homeport.

2. On August 11, police officers appeared at Mr. Sullivan's home, handcuffed and arrested him, and charged him for having written, three days earlier, "The Jerk" in three-inch-high letters on a 6' x 4' Molinaro campaign poster that had been illegally posted on the fence of a construction site. When the officers processed him at a local precinct, they told Mr. Sullivan that they had been following him for several days and that he had made "enemies upstairs." Reiterating that he had made "enemies upstairs," the officers then attempted to schedule an initial court date for over three months later and after the borough president election scheduled for November 3. The charges were later dropped completely by the District Attorney's Office.

3. As a result of the defendants' actions, Mr. Sullivan halted his advocacy against Mr. Molinaro's Homeport development plans, fearful for himself and the Staten Island environmental advocacy organization he leads. On September 16, Mr. Molinaro and Mayor Michael Bloomberg announced that a private developer had been chosen to develop the Homeport. The *Staten Island Advance* reported that the developer's former president, whose sons now run the company, recently served a two-year prison term for bribing New Jersey public officials. On November 3, Mr. Molinaro was re-elected.

4. The defendants violated Mr. Sullivan's rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution, as well as Article 1, Sections 8, 11 and 12 of the New York State Constitution and the common law of New York. He seeks a declaration that the defendants violated his rights, injunctive relief, an award of compensatory and punitive damages, and attorney's fees.

## JURISDICTION AND VENUE

5. This court has subject-matter jurisdiction over the plaintiff's claims pursuant to 28 U.S.C. §§ 1331, 1343(3-4). Supplemental jurisdiction is asserted over state-law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b) in that plaintiff's claims arise in the Eastern District of New York.

7. Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201, 2202. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure. An award of costs and attorneys fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

8. Plaintiff EDWARD KERRY SULLIVAN is a resident of Staten Island, New York.

9. Defendant the CITY OF NEW YORK is a municipal corporation within the State of New York.

10. Defendant EDWARD RANIERI is a Police Officer employed by the New York City Police Department. He is sued in both his official and individual capacities.

11. Defendant MATTHEW MAIORANA is a Police Officer employed by the New York City Police Department. He is sued in both his official and individual capacities.

## FACTS

### The Plaintiff Kerry Sullivan

12. With the exception of having been born in Manhattan, Edward Kerry Sullivan is a life-long Staten Islander. Now 52, he is a well-known community organizer.

13. Mr. Sullivan lives with his wife Vicky and their golden retriever Bear in a three-story apartment building near the Stapleton Homeport, a former naval yard on the North Shore of Staten Island.

14. Inspired by the stories of local sailors that he heard as a teenager, Mr. Sullivan embarked on a career as a merchant marine. Through his work, Mr. Sullivan traveled the world— he supplied gear and equipment to oil rig platforms in the Gulf of Mexico, delivered aid to South American countries, and sailed the corridor from Valdez, Alaska to Panama.

15. During his time at sea, Mr. Sullivan developed a passion for, and deep knowledge of, marine life and ecosystems. He is, and has been, a lifelong advocate for issues related to the marine and coastal environment.

16. From 1984 to 1986, Mr. Sullivan battled with severe paralysis caused by Guillian-Barré Syndrome. He also continues to suffer from a non-compacting left ventricle, which makes him particularly susceptible to long bouts of exhaustion. Additionally, he was recently diagnosed with liver cancer, and he is seeking an organ donor.

17. Despite his disability, Mr. Sullivan spends approximately eight hours each day pursuing his passion: protecting marine ecosystems through political advocacy. As the Executive Director of the Natural Resources Protective Association (NRPA), Mr. Sullivan volunteers his time, energy, dedication, and passion to the organization; he receives no monetary compensation from the NRPA.

18. The NRPA is a 501(c)(3) non-profit organization dedicated to preserving marine habitats and ensuring public shoreline access. In the past, the NRPA has provided local assistance to national environmental organizations that have successfully engaged in legal action to enjoin large chemical corporations from dumping toxic chemicals into New York and

New Jersey harbors. The NRPA has worked to restore local beaches and create public parks along the shoreline in Staten Island. Consistent with its goals, the NRPA has publically advocated against the commercial development of the Stapleton Homeport.

19. As the Executive Director of the NRPA, Mr. Sullivan manages the organization's 12,000-person mailing list, plans events, applies for grants and solicits donations, and contacts public officials. Recently, Mr. Sullivan spearheaded environmental clean-ups around the North Shore, where local residents and students gathered to pick up trash and landscape the neglected waterfront near the Homeport.

20. Even when he is not working for the NRPA, Mr. Sullivan pursues his passion for the marine environments that surround Staten Island. He advocates for environmentally responsible sport fishing and operates a website, Islandwebs.com, promoting catch-and-release bass fishing in Staten Island. Mr. Sullivan believes that everyone should be able to benefit from the ocean's natural beauty.

21. Mr. Sullivan has been recognized for his knowledge of marine ecosystems and his dedication to environmentalism. Among his achievements, he served on the New York State Marine Resources Advisory Council from 1996 to 2006. He was first appointed in 1996 on the recommendation of New York State Assemblywoman Elizabeth A. Connelly and was reappointed on the recommendation of Assembly Speaker Sheldon Silver in 2002. For his work with the NRPA, New York State Assemblyman Robert A. Straniere awarded Mr. Sullivan with the "Community Hero and Heroine Award for 2000." Additionally, Mr. Sullivan has written several articles related to the environment and shoreline access in various local newspapers, and in 1997 he received the New York Press Association's Writer of the Year for Top Story of the Year award.

Events Leading Up To Mr. Sullivan's Arrest

22. In 2001, James P. Molinaro succeeded Guy Molinari as Staten Island Borough President. Since 2003, Mr. Molinaro has made the commercial development of the Stapleton Homeport a key to his political legacy as Borough President.

23. The Stapleton Homeport, located on the North Shore of Staten Island near the St. George ferry terminal, is the former home of a U.S. Navy base that closed in 1995. That year, New York City gained ownership of the Homeport; yet, the site has remained undeveloped and unused. In 2004, the city allocated $66 million to construct a public park and an esplanade on the Homeport property but failed to follow through with its commitment to develop the land for use by the residents of Staten Island and New York City.

24. Working as part of the Homeport development task force, Mr. Molinaro stated that he believed a development plan would be in place by 2005. Although his goal was not realized, Mr. Molinaro continued to work as part of the task force.

25. For at least as long as the city has owned the Homeport—and throughout Mr. Molinaro's tenure as Borough President—Mr. Sullivan has been persistent, vocal, and effective in his opposition to Mr. Molinaro's development policies. Mr. Sullivan opposes the commercial development of the Homeport because he believes that the City of New York and the Borough must follow through with their commitment to transform the Homeport into public parkland.

26. In 2003 and 2004, Mr. Molinaro publically criticized the efforts of environmental groups on Staten Island that opposed his development efforts. Specifically, Mr. Molinaro referred to such groups as "obstructionists."

27. In his 2009 reelection bid, Mr. Molinaro repeatedly issued press releases on his website promoting his efforts to secure contracts with potential Homeport developers. Mr. Molinaro stood to gain politically by securing a contract to commercially develop this tract of prime waterfront real estate.

28. In response, Mr. Sullivan sent letters in early August to elected officials in the State of New York—including State Senators, State Assembly members, and members of the New York City Council—expressing opposition to the commercial development of the Stapleton Homeport.

29. Mr. Sullivan sent this same letter to Mr. Molinaro.

30. In the letter, Mr. Sullivan demanded that the Borough remove a fence that has surrounded the former Stapleton Homeport for twenty years so that the residents of New York could have access to the waterfront. He also demanded that the Borough turn the property over to the New York City Parks Department until a waterfront park could be built. Citing the public trust doctrine, the letter stated that the land should not be sold to private developers.

31. On August 5, the *Staten Island Advance*—the only daily newspaper focusing exclusively on Borough news and politics— published a letter to the editor from Mr. Sullivan on its website. In the letter, Mr. Sullivan expressed both his and the NRPA's objections to restricting public access to the waterfront near the Homeport. He specifically criticized the prospect of turning the Homeport and another property over to private developers: "These properties are owned by the people of Staten Island and the powers that be are just waiting to turn them over to private contractors to make a fortune on prime real estate without investing a penny!" The letter closed with a plea to Staten Island voters:

"Election Day is less th[a]n 75 days away. Don't forget who did what for you in November."

32. The letter prominently appeared in the August 8 print edition of the paper under the heading "Your Opinion."

33. On or about August 8, 2009, Mr. Sullivan noticed that a construction fence abutting a public sidewalk on Hylan Boulevard and Tompkins Avenue in Staten Island had been "wall-papered" with James Molinaro campaign posters. Mr. Molinaro's posters were each approximately six feet by four feet in size and covered all of the available space on the fence.

34. Earlier that year, Mr. Sullivan had asked for and received permission to post three 22-inch by 12-inch signs for his website, Islandwebs.com, on this same fence. Mr. Sullivan's posters were still affixed to the fence in August 2009 before they were replaced by Mr. Molinaro's illegally posted campaign signs.

35. Upon information and belief, Mr. Sullivan's signs had been torn down and replaced with campaign posters by Mr. Molinaro or agents associated with his office in violation of New York City Administrative Code § 10-119 and New York Penal Law § 145.00.

36. In a September 14, 2004 press release, Borough President Molinaro decried the practice of posting campaign signs on public property as a violation of the Administrative Code and urged that action be taken against offenders. Specifically, Mr. Molinaro said that offending "candidates should know that defacing public property is against the law… [O]n Staten Island, we respect the law and demand that they do the same."

37. Upon information and belief, neither Mr. Molinaro, nor anyone from his office, was arrested or fined for posting his signs illegally.

38. According to the New York City Sanitation Department, Mr. Molinaro was not issued any citations for violating Administrative Code § 10-119 from July, 2009 until November, 2009.

39. Further, upon information and belief, neither Mr. Molinaro, nor anyone from his office, was arrested for damaging the fence by affixing posters to it, or damaging Mr. Sullivan's legally posted signs by wall-papering over them. Both acts violate Penal Law § 145.00.

40. On August 8, upset about the Borough President's Homeport development policies and frustrated that his signs had been replaced by Molinaro's campaign posters, Mr. Sullivan decided to express his criticism by writing "The Jerk" on the corner of one of the illegally posted campaign signs in handwriting approximately three inches high by six inches wide. He then returned home.

### Mr. Sullivan's Arrest on August 11, 2009

41. At approximately 7:00 p.m. on August 11, 2009, Mr. Sullivan called both his local precinct and 911 to report criminal activity near his apartment complex. He identified himself to both the precinct and 911 dispatchers.

42. Mr. Sullivan and his wife Vicky were waiting outside their apartment building for the police to arrive in response to his call when, at approximately 8:00 p.m., two plainclothes police officers pulled into the apartment complex's driveway in an unmarked car and parked behind his van. The officers approached Mr. Sullivan, who was standing on the front stoop of his apartment building, but did not identify themselves. These officers were Officer Edward Ranieri and Officer Matthew Maiorana.

43. The officers pointed to Mr. Sullivan's van and asked him whether or not the vehicle that they were pointing to was his. Mr. Sullivan said "yes." The officers then asked him if his name was Edward Sullivan. Again, Mr. Sullivan said "yes."

44. After receiving affirmative answers to their questions, the officers asked Mr. Sullivan if he wrote "The Jerk" on one of Borough President Molinaro's campaign signs. Mr. Sullivan answered "yes." The police did not ask any questions about the criminal activity Mr. Sullivan had reported.

45. After thanking him for being honest, the officers placed Mr. Sullivan under arrest, handcuffed him behind his back, and placed him in the back of their unmarked car. He was never read his Miranda rights.

46. Mr. Sullivan's wife Vicky asked to know why her husband was being arrested. They showed her a picture of the Molinaro campaign poster upon which Mr. Sullivan had written "The Jerk," pointed to the words "The Jerk," and said that they were arresting Mr. Sullivan for graffiti.

47. Vicky told the officers that Mr. Sullivan needed to take medicine critical to his cancer treatment. Officer Ranieri responded by forcibly pushing Vicky towards the front door of the apartment building, telling her that she needed to go inside.

48. While Mr. Sullivan sat handcuffed in the back of the unmarked police car, Vicky, crying, pleaded with the officers to allow her to give Mr. Sullivan his medicine. After resisting for almost twenty minutes the officers finally relented and allowed Vicky to give Mr. Sullivan his cancer medicine.

49. Mr. Sullivan continued to sit quietly in the back seat of the unmarked police car as the officers drove him to Precinct 120 in Staten Island. When he arrived at the Precinct, Mr.

Sullivan was taken to a private room with two couches and a desk, not the regular booking room or a holding cell. He repeatedly requested to speak with a lawyer, but the officers ignored his request.

50. The police then took him upstairs to fingerprint him. After being fingerprinted, Mr. Sullivan was taken back to the private room.

51. On the way, Mr. Sullivan noticed that some other members of the NRPA and other environmental groups had come to the station because they were concerned about his arrest. They had been notified of his arrest by Mr. Sullivan's wife Vicky. At this point, Officer Ranieri went to the front of the station to address the NRPA members gathered at the precinct while Officer Maiorana escorted Mr. Sullivan back to the private room.

52. In the private room, Officer Maiorana told Mr. Sullivan that he was being charged with a Class A misdemeanor punishable by up to a year in prison. Additionally, Officer Maiorana told Mr. Sullivan that he would have a desk appearance scheduled for November 23, 2009. Mr. Sullivan questioned the officer's motivations because the date of the appearance ticket was scheduled for November 23, almost three weeks after the scheduled election for Borough President.

53. After Mr. Sullivan pressed the issue, Officer Maiorana told Mr. Sullivan that he had been called in from Brooklyn to follow Mr. Sullivan. Officer Maiorana stated that he and Officer Ranieri had been following Mr. Sullivan for four days with the hope of catching him engaged in a felony.

54. When Mr. Sullivan expressed astonishment that he had been under surveillance and that he had been targeted for arrest, the officer explained that Mr. Sullivan had "enemies upstairs."

55. Given the circumstances of his arrest, and upon information and belief, the "enemies upstairs" that Officer Maiorana referred to included Mr. Molinaro and/or agents associated with Mr. Molinaro's office.

56. Mr. Sullivan was distraught and angered by what the officer told him. He questioned the appropriateness of the charge, stating that Mr. Molinaro's placement of the campaign posters on the fence was illegal. And again, Mr. Sullivan questioned the planned date of the arraignment.

57. After listening to Mr. Sullivan's questions and concerns, Officer Maiorana left to confer with his partner, Officer Ranieri. When Officer Maiorana returned, he issued Mr. Sullivan a Desk Appearance Ticket (D.A.T.) for September 11, 2009.

58. When Mr. Sullivan again questioned the appropriateness of a Class A misdemeanor charge for his conduct, Officer Maiorana reiterated that there was nothing he could do because Mr. Sullivan had "enemies upstairs."

59. Mr. Sullivan was released from custody at approximately midnight on August 12, 2009 with a D.A.T. charging him with violating N.Y. Penal Law § 145.00, criminal mischief in the fourth degree. According to the NYPD Patrol Guide, a Desk Appearance Ticket may not be issued to a person charged with violating this section.

60. Officer Ranieri signed the release ticket after another officer on duty at Precinct 120, whose identity is unknown, refused to sign it on the grounds that he "didn't want anything to do" with Mr. Sullivan.

61. After Mr. Sullivan was released, his friend drove him home, passing the intersection of Hylan Boulevard and Tompkins Avenue. Mr. Sullivan noticed that all of Molinaro's illegally posted campaign signs had been removed from the construction fence.

62. At no time did probable cause exist to arrest, detain, or charge Mr. Sullivan.

63. This is not the first time the Staten Island Borough President's office may have prompted the arrest of an advocate. In 2001, the New York Civil Liberties Union filed suit on behalf of Terence Hunter, who was arrested by NYPD officers after sending a critical letter to former Staten Island Borough President Guy Molinari about a North Shore community center. The city quickly settled Mr. Hunter's retaliatory arrest case for $200,000. At the time of Mr. Hunter's lawsuit, Mr. Molinaro was serving as Mr. Molinari's Deputy Borough President, a position that he had held since 1990.

64. The defendants' actions were taken under color of law.

The Aftermath of Mr. Sullivan's Arrest

65. The stress of Mr. Sullivan's arrest exacerbated his preexisting health conditions. Mr. Sullivan was unable to get out of bed or leave his home for three days.

66. Mr. Sullivan also refrained from campaigning against the Stapleton Homeport development and Mr. Molinaro's reelection as he awaited the resolution of his misdemeanor charge.

67. On September 11, 2009, Mr. Sullivan appeared at the court as instructed. He was notified at that time that the Richmond County District Attorney had declined to prosecute the case and that the charge against him was being dropped. At no time was a formal probable cause determination made regarding Mr. Sullivan's arrest.

68. Though it has been months since the charges against Mr. Sullivan were dropped, Mr. Sullivan feels that he has no choice but to stop the production and distribution of a home-made video about developing public park space on the Staten Island waterfront. He had wanted to make a video demonstrating how Staten Island's North Shore could become a

13

thriving, beautiful public space similar to former industrial docks in Boston and Baltimore that were successfully converted into parks. But because of his arrest, Mr. Sullivan fears that if he makes and distributes this video, he will put his liberty, his family, and his organization, the NRPA, in jeopardy.

69. On September 16, 2009, Mayor Michael Bloomberg and Staten Island Borough President James Molinaro announced that Ironstate Development Company—a New Jersey-based developer responsible for luxury condominium projects in Hoboken and Jersey City—had signed a contract with the city to develop the Stapleton Homeport. Ironstate's goal is to construct 800 luxury residential units, as well as commercial retail space. The City of New York sold Ironstate the prime waterfront property for only $12 million. According to the *Staten Island Advance*, the former president of Ironstate recently served a two-year prison term for bribing New Jersey public officials to secure development contracts in Hoboken. Ironstate is currently run by the former president's two sons.

70. Mr. Molinaro lauded this development on his campaign website as part of his work to "make Staten Island a more 'self-sustaining community.'"

71. Despite Mr. Sullivan's ardent and vociferous opposition to the commercial development of the Homeport by private contractors, he has refrained from speaking out against these recent developments because he fears reprisals against himself, his family, and the NRPA.

72. On November 3, 2009, James Molinaro won his reelection bid for a third term as Staten Island Borough President.

## JURY DEMAND

73. The plaintiff demands a trial by jury on each and every one of his claims.

## FIRST CAUSE OF ACTION – FEDERAL RIGHT TO FREE SPEECH

74. The defendants violated the plaintiff's rights under the First Amendment of the United States Constitution and 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION – FEDERAL RIGHT TO BE FREE FROM UNREASONABLE SEIZURE

75. The defendants violated the plaintiff's rights under the Fourth Amendment of the United States Constitution and 42 U.S.C. § 1983.

## THIRD CAUSE OF ACTION – FEDERAL RIGHT TO EQUAL PROTECTION OF THE LAW

76. The defendants violated the plaintiff's rights under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION – STATE RIGHT TO FREE SPEECH

77. The defendants violated the plaintiff's rights under Article I, Section 8 of the New York State Constitution.

## FIFTH CAUSE OF ACTION – STATE RIGHT TO EQUAL PROTECTION

78. The defendants violated the plaintiff's rights under Article I, Section 11 of the New York State Constitution.

## SIXTH CAUSE OF ACTION – STATE RIGHT TO BE FREE FROM UNREASONABLE SEIZURE

79. The defendants violated the plaintiff's rights under Article 1, Section 12 of the New York State Constitution.

## SEVENTH CAUSE OF ACTION – STATE RIGHT TO BE FREE FROM FALSE ARREST

80. The defendants violated the plaintiff's right under the common law of New York by arresting him without probable cause to believe that he had committed a crime.

## EIGHTH CAUSE OF ACTION – STATE RIGHT TO BE FREE FROM FALSE IMPRISONMENT

81. The defendants violated the plaintiff's rights under the common law of New York by detaining him and imprisoning him without probable cause to believe that he had committed any crime.

## NINTH CAUSE OF ACTION – STATE RIGHT TO BE FREE FROM MALICIOUS PROSECUTION

82. The defendants violated the plaintiff's rights under the common law of New York as to malicious prosecution.

WHEREFORE, the plaintiff requests that this Court:

(1) Assume jurisdiction over this matter;

(2) Issue a permanent injunction directing the defendants to return to the plaintiff all documents reflecting his being followed, arrested and detained, and ordering the defendants to expunge all computer information reflecting the plaintiff's surveillance, arrest and detention;

(3) Issue a declaratory judgment that the defendants' violated the plaintiff's rights;

(4) Award the plaintiff compensatory damages;

(5)   Award the plaintiff punitive damages;

(6)   Award the plaintiff attorneys' fees; and

(7)   Grant any other relief the court deems appropriate.

Respectfully submitted,

*/s/ Christopher Dunn*

CHRISTOPHER DUNN
ADAM HUNT*
MATTHEW GORMAN*
STEPHEN KNOEPFLER*
New York Civil Liberties Union Foundation
125 Broad Street, 19th Floor
New York, New York 10004
(212) 607-3300

Counsel for Plaintiff

Dated: April 28, 2010
       New York, N.Y.

* Law Students enrolled in New York University School of Law's Civil Rights Clinic. The plaintiff has sought leave of the court for the students to appear on this matter.